## GREAT AMERICAN INDEMNITY CO. v. BLAKEY et al.

### No. 10904.

Court of Civil Appeals of Texas.
San Antonio.

March 5, 1941.

Rehearing Denied May 21, 1941.

John C. North, of Corpus Christi, for appellant.

Sidney P. Chandler, of Corpus Christi, for appellees.

SMITH, Chief Justice.

Mrs. Agnes Blakey brought this action against Great American Indemnity Company to recover upon an insurance policy issued by the Company to the City of Corpus Christi upon certain employees of the City, including Mrs. Blakey's husband, Chas. R. Blakey, deceased, whose death was alleged to have resulted from accidental injuries sustained in the course of his employment by the City. The insurance policy was the same as that involved

in Great American Indemnity Company v. Blakey, Tex.Civ.App., 107 S.W.2d 1002, decided by this court and dismissed for want of jurisdiction by the Supreme Court. Reference is made to that report for an elaboration of the facts in this case.

This appeal is from a judgment rendered for the plaintiff in pursuance of a directed verdict, and the Indemnity Company has appealed. Mrs. Blakey will be here referred to as plaintiff and the Indemnity Company as defendant.

The policy sued on was issued to the City of Corpus Christi, indemnifying the City against legal liability for accidental injuries sustained by its employees in the course of their employment. The contract was in the usual form of an indemnity policy of that character. But there was attached to the policy a rider extending the benefits of the contract to employees of the insured, and providing for compensation to such employees in case of accidental injuries (in course of employment) resulting in disability, or to beneficiaries in case of death resulting from such injuries. It was stipulated in the rider that in case of injury or death the employee or his beneficiaries would be entitled to be compensated according to the standards provided in the Workmen's Compensation Act, Vernon's Ann.Civ.St. art. 8306 et seq. The policy and the "Voluntary Compensation Agreement" are the same, in effect, as in McCaleb v. Continental Casualty Co., 132 Tex. 65, 116 S.W.2d 679. In that case it was held, unmistakably and positively, that the provisions of the rider inure to the benefit of an employee, or his beneficiaries, who may sue the Company directly and recover on a proper showing, the same benefits they would be entitled to from an insurance carrier in a typical Workmen's Compensation case. Under that authority we hold that Mrs. Blakey and her children, as statutory beneficiaries, are entitled upon a proper showing to recover the amount of compensation which would have accrued to them against an insurance carrier under the terms of the Act.

■ As stated, the trial judge directed the jury to return a verdict in favor of plaintiff for a specified amount, thereby assuming that every fact essential to her recovery in the amount awarded was conclusively established by competent evidence. We are of the opinion, after carefully considering all the testimony tediously brought forward into the briefs, that the trial judge went beyond his discretion in directing a verdict and thereby himself resolving issues which were not conclusively established as matters of law, but upon which the testimony was inconclusive, rendering it an ideal case for a jury. It is regrettable that this is so, for in all other material respects plaintiff's case was well established, needing only jury findings on the issues of the death of plaintiff's husband (a) from accidental injuries, (b) sustained in the course of his employment, to entitle her to judgment. Upon those issues, however, the evidence is not, in our opinion, so conclusive that reasonable minds could not differ on the effect thereof.

■ In weighing the evidence for the purpose of passing upon the correctness of a directed verdict for plaintiff in this jury case, this court is required to give full credence and effect to all the testimony favorable to defendant or adverse to plaintiff. With this elemental rule in mind, we will summarize the testimony tending to refute plaintiff's prima facie case that decedent's death was caused or contributed to by the alleged accidental injury in line of duty on March 30, 1934.

But first, it may be said, conclusively, that the decedent had had a severe heart attack following influenza in 1918 or 1919, eventuating in a more or less chronic "leakage" or "enlarged" heart, of which he was never fully cured. He lived nearly two years after the alleged accidental injury, which he claimed consisted of a sprained back resulting from the strain of pushing against a stalled loaded truck. It was claimed that he was suffering (following and as a result of the alleged accident) from dislocation or strain of the sacroiliac joint, and that this condition, so originating, finally resulted in his death. We cannot say, least of all as a matter of law, that the evidence was so overwhelming that a jury could not reasonably refuse to find for plaintiff on the issue. In order to so hold we would have to say—and yet we cannot say—that, upon the evidence adduced, reasonable minds would not differ upon the ultimate issue, which is the true test of the propriety of a directed verdict.

Having found that the evidence favorable to plaintiff would have abundantly supported a jury finding that decedent's death was caused or contributed to by the claimed accidental injury, we will not set out that evidence here, but must ignore it, and summon only such testimony as tend-

ed to support a negative finding upon that issue. That testimony came only from physicians who examined, and some who also treated, the decedent, before the alleged accident, and in the two-year interim between that time and his death—decedent was injured on April 24, 1934, and died on March 30, 1936.

Dr. James M. Tyree testified for plaintiff. It appears that Dr. Tyree began treating decedent a few months before the latter's death, and issued the official death certificate in which it was recited that the "principal cause" of decedent's death and "related causes of importance" were a "congestive heart failure, Myocarditis," and "contributing causes of importance, Aortia Sciatic Neuritis," which diagnosis was "confirmed" by X-ray. Under the head of "External causes (violence)" and "Date of Injury" in the certificate was the notation "Sacroiliac (a) strain, 2 years," and "Manner of injury, lifting." Dr. Tyree testified, first by deposition taken before decedent's death, that he had treated decedent for "complaint of his back"; that he found "an old anterior torsion strain or subluxation of the right sacroiliac joint, and the treatment was manipulation to correct the subluxation or minor displacement;" that this was "not an acute condition now, it is a chronic thing." The witness admitted on cross-examination, however, that decedent "could have had this same condition, same death, without this injury."

Dr. Barnard also testified for plaintiff. He had known decedent forty or fifty years and had been his family physician nineteen or twenty years, but had not known "until recently" that the decedent had ever suffered from any injury to his back; that four or five months after the alleged accident, he examined decedent at his office and "found a painful back"; that he "was not able to determine any fracture or any dislocation, other than he was very tender over the lower part of his back * * * at the sacroiliac joint;" that an enlargement of the sacroiliac joint could possibly follow an injury to that joint.

Dr. Thompson testified as a witness for defendant that at the request of decedent's then attorney, John J. Pichinson, he examined decedent on May 7, 1934, shortly following the accident, and made a report of his findings which were based on decedent's history of his case. He reported to the attorney that he found in decedent "evidence" in his chest of "chronic bronchitis. Leakage of heart at the mitral valve heard at the apex;" in his back, "Limitation of mobility of lower vertebra in standing, pain elisted standing and severe pain in getting up. Sacroiliac strain." Dr. Thompson's prognosis was that decedent should recover in eight to twelve weeks depending upon amount of injury to the ligaments. He further testified, as stated in defendant's brief: "That he didn't think it would be possible for a man to be injured to the extent that Mr. Blakey claimed he was, in the manner that he claims he was injured. Testifying relative to the nature of Mr. Blakey's injury—that nature usually restores that (condition) from three weeks to two or three months. Yes, in three weeks to six weeks ordinarily, or eight weeks—something like that it will be overcome. On cross examination—that if the place where these two bones come together the tissue had been pulled loose, it would stay pulled loose—there wasn't any evidence of it being pulled loose— No, I didn't discover it. Yes, if the diagnosis of sacroiliac strain was true, Mr. Blakey should have recovered from within three weeks to eight weeks—some of them run two or three months, but ninety-nine per cent of them will clear up in eight weeks— I never saw one run for eighteen months— if it did he could have something else wrong with him."

Dr. C. O. Watson, a witness for the defendant, testified that he examined decedent the day after the claimed accident when decedent "complained with his back" and "I examined his back to see if there were any signs of an injury, and I didn't find any objective symptoms, that is, no symptoms that I could detect, I only had what he said about his back hurting. He said that he had been lifting the day before on a truck that stuck, he and two or three other fellows, and that he had had his shoulder up against the body of the truck and helping to push the truck out of the mud, and that in doing that he had in some way hurt his back. Now, my idea was that he couldn't have hurt his back seriously in pushing with his shoulder up against the truck, and so, after examining him rather carefully, I was of the opinion that there was really no injury there." Dr. Watson testified further that it would be impossible to throw the sacroiliac joint out of place from the kind of injury Mr. Blakey told him he had. That if the joint had been pushed out of place to any extent, no mat-

ter how small, it would have been evident to him upon examination; that he found no such injury as that.

It should be borne in mind that the decedent, who testified on the first trial, was the only witness who testified to the fact of the claimed injury. His testimony was, simply, that while helping others push a stalled, loaded truck he felt a pain or wrench in his back, and, in effect, that this and kindred pains pursued him to his death two years later.

Now, the primary issues of the case as they would have been submitted to the jury were, roughly, as follows:

(1) Do you find from a preponderance of the evidence that on April 24, 1934, Blakey sustained an accidental injury in the course of his employment with the City of Corpus Christi? Answer yes or no. If "yes" then

(2) Do you find from a preponderance of the evidence that such accidental injury, if any, caused or contributed to cause the death of said Blakey on March 30, 1936. Answer yes or no.

Had the trial judge submitted those issues in proper form to the jury and the jury had answered either or both of them in the negative, we are of the opinion that under the record the trial court would have been without authority to set aside or disregard those findings and render judgment for plaintiff in spite of them, and they would likewise have been binding on this Court. We think that is the true test of the propriety of the directed verdict in this case, and that being our conclusion we have no alternative but to reverse.

Accordingly, the judgment is reversed and the cause remanded for another trial.

### On Motion for Rehearing.

In her motion for rehearing appellee reminds this court of the fact that prior to this claim and suit appellant paid appellee's husband, the deceased employee, $100 in settlement of his prior claim for injuries (Great American Indemnity Company v. Blakey, Tex.Civ.App., 107 S.W.2d 1002), and appellee now urges that this payment by the company was an admission, and appellant is now precluded from denying, that the decedent received accidental injuries in the course of his employment.

It may be true that ordinarily when an insurance carrier pays an injured employee for disabilities in such cases, it amounts to the admission now claimed by appellee. But in this case it appears that the amount was paid by appellant to the employee in consideration of a compromise settlement of the employee's claim, and not as an admission that the latter was accidentally injured in line of duty. In such case the claimed rule is not deemed applicable.

Appellee's motion for rehearing is overruled.